IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA      )
                              )
                              )
          v.                  )          Criminal No. 15-163M
                              )
LEE ROBERT MOORE,             )
                              )
          Defendant.          )

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF
MOTION FOR PRE-TRIAL DETENTION**

The United States respectfully submits this memorandum and accompanying exhibits in support of its request that Defendant be detained pending trial based on danger to the community and risk of non-appearance.   The Government intends to reference these exhibits, and other evidence, during the detention hearing scheduled for 1:00 p.m, on November 19, 2015.   We are providing the exhibits now to permit the Court time to review them in advance of the hearing.

**I.      THE LEGAL STANDARD FOR PRE-TRIAL DETENTION**

Pursuant to 18 U.S.C. § 3142(e), the Court shall order a defendant detained pending trial if the Court finds that no condition or combination of conditions will reasonably assure the safety of any other person or the community or that no condition or combination of conditions will reasonably assure the appearance of the defendant.   Pursuant to 18 U.S.C. § 3142(f), the government may move for pre-trial detention:

(1) . . . in a case that involves –

\*            \*                    \*                    \*            \*

(E) any felony that is not otherwise a crime of violence that involves a minor victim . . . .

(2) . . .  in a case that involves –

1

(A) a serious risk that such person will flee; or

(B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

As illustrated by the attached exhibits and explained below (and during the forthcoming hearing), each of these bases supports detention here.

In determining whether there are conditions of release that will reasonably assure Defendant's appearance and the safety of any other person and the community, the Court must take into account:

(1) the nature and circumstances of the offense charged, including whether the offense involves a minor victim;

(2) the weight of the evidence against the accused;

(3) the history and characteristics of the person, including;

    a.  his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    b.  whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial; and,

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*See* 18 U.S.C. § 3142(g).

## II.    <u>FACTORS SUPPORTING PRE-TRIAL DETENTION</u>

For reasons we will explain at the hearing, Defendant should be detained because: (1) he is a danger to the community; (2) he has already obstructed the investigation into his conduct and is a risk to continue doing so if released; and (3) to a lesser extent, he is a flight risk.

A.      **Defendant Poses a Danger to the Community**
        **and a Continuing Risk of Obstruction of Justice**

1.      **The Nature and Circumstances of the Offense**

Defendant – a sworn federal law enforcement officer tasked with protecting the White House Complex and those who live and work in it – used mobile devices to engage in online relationships of a sexual nature with individuals he believed to be minor, teenage girls.   By his own admission in a recorded interview, he did this at his home and at the White House (while on duty) for a period of at least one year.   By his own estimation, he did this with multiple people he believed were minor, teenage females located across the United States.[1]

The complaint – which includes only the least serious child exploitation charge that Defendant ultimately faces – focuses on Defendant's conduct in carrying on a months-long, online relationship with a person he believed to be a 14-year-old girl (UC-1/UC-2) via his mobile device. Defendant discussed meeting UC-1/UC-2 to engage in sexual activity, describing in vivid and disturbing detail sexual activities that he wished to engage in with this supposed 14-year-old girl. In a number of the chats, including some of the most-sexualized chats, Defendant stated that he was communicating from work (*i.e.*, the White House).   During a September 24, 2015 chat, for instance, Defendant transmitted a non-explicit video of himself in uniform from the White House. *See* Screenshot (Ex. 1) and Video Clip of Defendant (Ex. 1A - Disk).

Portions of the chats are quoted in the complaint and will not be repeated at length here. To provide the Court with fuller context, however, we have attached a more comprehensive log of the online chats between Defendant and UC-1/UC-2 via the Kik application.   *See* Lantern

---

1       In his recorded interview, Defendant stated that he was unsure of the exact number of potential female minors with whom he engaged in online sexual chats.   At different points in the interview, Defendant stated that "it could be four, it could be thirty," before asserting that the number approximated ten minor, teenage females.

Forensic Report (Ex. 2).[2]   During an October 6, 2015 chat, Defendant transmitted a sexually explicit image of his erect penis in an effort to entice UC-2 into taking and sending to him a picture "in [her] panties."   *See id.*   Defendant did this while the supposed 14-year-old girl was watching television with her mother, prompting Defendant to instruct UC-2 to go to the bathroom to produce and send the image and writing that "trust is a two way street."   *See id.*

Also attached are sample screenshots of Defendant's communications with UC-1/UC-2 via the Meet24 application.   *See* Meet24 Screenshots (Ex. 3).   In the excerpted messages, Defendant engages UC-1/UC-1 in banter about her school clothing, and noted:   "I see what people wear on school trips to DC."   *Id.*   During his recorded interview, Defendant claimed that he did most of his online chatting with minors via this app.

In sum, Defendant was doing more than simply exhibiting himself online to a person he thought was a 14-year-old girl (and others like "her").   He was attempting to make virtual and visual contact online – and discussing meeting for sexual contact offline – in a way that would permit the Government to charge additional, more serious, child exploitation crimes.   As he admitted during his recorded interview, Defendant engaged in this conduct because he has a sexual interest in 14-year-old females, which he described as "the absolute minimum" in terms of age. The nature and circumstances of his crimes targeting minor girls for sexual exploitation alone are sufficient to justify a finding that he poses a danger to the community that cannot be relieved by any combination of release conditions.

---

2      Images representing UC-2 and a sexually explicit image of Defendant have been redacted.

### 2.    Defendant Has Obstructed Justice by Destroying Digital Evidence of His Criminal Conduct

Since becoming aware that he was the target of an investigation on November 6, 2015, Defendant has destroyed digital evidence of his criminal conduct with multiple minors that had been located on his mobile devices and in online accounts.   As a result, he has now increased his criminal exposure by committing the additional crime of obstruction of justice, which carries a maximum jail term of 20 years.   *See* 18 U.S.C. § 1519.   The circumstances surrounding Defendant's obstructionist acts are summarized below.   Should he be released, there is no reasonable basis to believe that Defendant will not continue to seek to destroy evidence of his crimes or to tamper with witnesses, including child victims.

On or about November 6, 2015, the United States Secret Service's Internal Affairs personnel communicated with a DSP detective, Homeland Security Investigations ("HSI") and Department of Homeland Security Office of Inspector General ("DHS-OIG") personnel involved in this investigation.   At that time, and from November 3 – 8, 2015, Defendant was on leave or was otherwise not scheduled to report for duty.   Defendant was scheduled to return to work at the White House on Monday, November 9, 2015.   Secret Service personnel expressed concern about Defendant's returning to duty at the White House, as scheduled on Monday, November 9, 2015.

DSP, HSI and DHS-OIG investigators involved in this matter informed Secret Service personnel that they intended to continue investigative activity over the weekend of November 6-8, and ultimately, that DSP would arrest Defendant on the morning of Monday, November 9, 2015 as he left his residence to travel to Washington for his scheduled work shift.   The investigators requested that the Secret Service not take any employment-related action against Defendant prior to the planned arrest on the morning of Monday, November 9, 2015.

According to Defendant's recorded interview statements, Secret Service personnel arrived at Defendant's Maryland residence without prior notification at approximately 11:00 p.m., on Friday, November 6, 2015.   Defendant was informed that he was immediately being placed on administrative leave pending an investigation (the nature of which was unspecified). Investigators did not learn of the Secret Service's personnel action until approximately 3:00 p.m., on Saturday, November 7, 2015.

While conducting online undercover activities earlier on Saturday, November 7, 2015, UC-1 noticed that Defendant's public Facebook profile had been switched to "private," preventing anyone other than his "friends" from viewing it.   UC-1 also noticed that Defendant's Meet24 profile had been deleted.

On Sunday, November 8, 2015, at approximately 5:00 p.m., a DSP detective assigned to this investigation spoke with a Secret Service official about potential gun-related danger associated with seeking to arrest Defendant at his residence the next morning (November 9, 2015) in light of the November 6th notification.   Defendant's Secret Service supervisor subsequently communicated with Defendant on Sunday, November 8, 2015, and asked Defendant to come to a Maryland State Police barracks on the morning of November 9, 2015 to discuss what the supervisor described to Defendant as an issue with a co-worker.   Defendant was not informed that he would be arrested on the morning of November 9, 2015.

On or about November 8, 2015, at approximately 8:52 p.m., UC-2 received a message, via Kik, from Defendant, which stated, in part:   "I don't think we should talk anymore.   I can't explain, but I have too much going on, and I need to pull away from talking to people online altogether.   This will be my last message.   I'm sorry, but I won't be on kik or meet 24 again." *See* Lantern Forensic Report, Ex. 2.

On or about the morning of November 9, 2015, Defendant reported to the Maryland State Police barracks.   During his recorded interview, Defendant admitted, *inter alia*, that he deleted his Meet24 and Kik accounts, as well as all images he had sent to or received from minor girls, or individuals who had represented themselves as minor girls, during their online communications. When asked about images he had sent to minors or received from then, Defendant stated words to the effect:   "They're all gone.   I deleted everything."

A preliminary forensic examination of the iPhone 6 seized from Defendant at the Maryland State Police Barracks and the iPhone 5 seized from Defendant's residence on November 9, 2015 confirmed that the Meet24 and Kik apps had been deleted or otherwise eradicated from Defendant's iPhones.   None of the images or videos exchanged by Defendant and UC-1/UC-2 has been found on the devices to date.   The recovery so far has been limited to forensic artifacts relating to the presence and usage of the Kik application at some point in time.

A major concern in any cybercrime investigation is the potential for the destruction of digital evidence needed to prove the full range of criminal conduct.   From the moment an individual suspects that he is under investigation for his criminal acts (if not before), law enforcement agencies are engaged in a race to secure digital evidence before suspects can destroy it.   This concern is particularly acute when children are the victims of sexual exploitation crimes, which cause ongoing traumatization that may not be redressed should evidence revealing the criminal conduct be destroyed before it can be discovered and secured by investigators.

Defendant has already demonstrated – and admitted – that he will destroy evidence that could prove the extent of his criminal conduct targeting minors for sexual exploitation.[3]   Coupled

---

3      To the extent Defendant persists in asserting that he committed no crimes against children beyond those currently known to the Government, he purposefully destroyed the very evidence

with his admissions that he targeted other minor girls for sexual exploitation, investigators are now left with only forensic fragments from his altered mobile devices to attempt to identify those minors and to discover the full nature of Defendant's conduct directed toward them.

Investigation since the forensic analysis of the devices began has led to the discovery of what appear to be two actual minor, teenage females with whom Defendant communicated online. Investigators are working to determine the nature of Defendant's contact with these minors.

Defendant, of course, is in a much better position than the investigators to know the full range of his conduct, the identities and locations of his child victims, and his digital footprints and repositories.   Because of the ubiquitous nature of the online world and because digital data is commonly stored in online accounts accessible by many types of connectible devices, no release conditions can reasonably assure that Defendant will not continue to destroy evidence of his criminal conduct if released.

### 3.    The Weight of the Evidence Supports Detention

In addition to the extremely serious nature and circumstances of Defendant's criminal conduct, the evidence against Defendant weighs heavily in favor of detention.   After initially lying to the interviewer, Defendant confessed to his criminal conduct focused on UC-1/UC-2 and others he believed were minor females.   That confession is fully corroborated by the digital evidence of chat logs and exchanged image files between Defendant and UC-1/UC-2 recovered by the UC device – even though Defendant had eradicated it from his mobile devices.   Defendant likewise confessed to his destruction of evidence relating to his criminal activities – a confession

that would support his claim.

also fully corroborated by the forensic examination of his mobile devices.   Additional evidence may be collected from the digital devices of identified child victims.

### 4.    Defendant's History and Characteristics Relating to Detention

At the detention stage, the Court is faced with the difficult task of attempting to predict, to the extent possible, whether this defendant will likely comply with conditions of release.   One of the most important factors in this assessment is the level of confidence that the Court has that Defendant is being truthful in providing information necessary to craft the conditions of release. The Court also must access Defendant's credibility when he agrees to abide by any conditions of release.   Here, we begin with a defendant who has already demonstrated a highly developed propensity for deception and the destruction of evidence.

That Defendant engaged in this particular criminal conduct under the circumstances at issue is also strongly indicative of whether he will fully comply with release conditions and the law.   Simply put, Defendant sought to use mobile technology to sexually exploit multiple minor, teenage girls from one of the most secure places on the planet.   He did so while in the presence of other highly trained law enforcement officers and just yards from the President of the United States, his family, and senior administration officials he was then protecting.   He did so during the same time period that his second child was born and was experiencing a medical condition that required a significant surgery.   The brazen and self-absorbed nature of his conduct is simply breathtaking and certainly gives this Court no reason to trust that he will abide by any and all conditions of release that this Court could impose.

Moreover, Defendant's training and expertise with firearms, law enforcement tactics and skills presents significant safety concerns in light of the allegations against him and the effect that his potential exposure to a significant period of incarceration may have on him if released.

Defendant is a law enforcement officer now of national disrepute who has been terminated from his position with the Secret Service and faces the prospect of federal prison and branding as a child sex offender.

Defendant has a strong affinity for, and expertise in using, firearms ranging from assault rifles to handguns.   That would not necessarily be a concerning fact, but for the current circumstances.   According to his interview statements and other information gathered in this investigation, he is a former Marine, a Secret Service firearms instructor and sharpshooter, and former competitive shooter.   His email account name is "shooterready9."

During the search of his residence, law enforcement officers located numerous firearms and other weapons throughout the residence.   *See* Search Photos (Ex. 4).   The firearms were mostly loaded and unsecured, despite the presence of a toddler in the house.   Their locations and loaded, unsecured nature was particularly troubling in light of Defendant's learning of an investigation into his conduct on November 6, and the prospect of law enforcement agents having to go to his home to attempt to arrest him.

According to the Probation Office's report, these weapons remain in Defendant's residence, but have been locked in a room to which "Defendant will not have access."   That is simply insufficient to assure the Court that Defendant will not be able to gain access to weapon of some type should he wish to harm himself or anyone else if released while awaiting trial and a likely return to incarceration.   Nor does it provide sufficient assurance of safety to others in the residence or to law enforcement agents who may have to return to the residence to take Defendant into custody if he does not comply with future Court orders.

## B.      Defendant Is a Flight Risk

Defendant faces a significant amount of time in prison, has foreign travel and contacts, and possesses highly sensitive information about the White House complex, Secret Service operations, and Secret Service protectees.   His knowledge therefore has a national security dimension to it. A stable job, family members and housing did not dissuade him from engaging in such destructive conduct.

Defendant will be indicated in a matter of weeks, and may face additional child exploitation charges, including attempted coercion and enticement of a minor.   Thus, Defendant may face a mandatory minimum sentence of 10 years of imprisonment.   He may also face a supervised release up to a term of life, and registration as a sex offender.   Based on the potential sentence that he faces and the information contained in the Pretrial Services report, Defendant presents some risk of non-appearance.

## CONCLUSION

For the foregoing reasons, and for those to be outlined at the detention hearing, the Government respectfully requests that Defendant be detained pending trial.

Respectfully submitted,

CHARLES M. OBERLY, III
United States Attorney

By:   */s/ Edward J. McAndrew*
Edward J. McAndrew
Assistant United States Attorney

Dated:    November 19, 2015

11